UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
GERALD SPRAYREGEN,

                Plaintiff,

-against-

PETER MANGIAMELI and PCH, INC.,

                Defendants.
----------------------------------------------------------X

For Online Publication Only

**MEMORANDUM & ORDER**
14-cv-6419 (JMA) (AKT)

APPEARANCES:

    Alex Kriegsman
    Kriegsman PC
    279 Main Street
    Sag Harbor, NY 11963
        *Attorney for Plaintiff*

    Jarrett M. Behar
    Sinnreich Kosakoff & Messina LLP
    267 Carleton Avenue, Suite 301
    Central Islip, NY 11722
        *Attorney for Defendants*

**AZRACK, United States District Judge:**

In this construction dispute, plaintiff Gerald Sprayregen alleges that defendants Priceless Custom Homes, Inc. ("PCH") and its principal Peter Mangiameli (collectively "defendants") are liable for breach-of-contract and fraud stemming from PCH's failure to perform a contract for demolition work. Plaintiff also alleges that PCH submitted fraudulent invoices to him concerning certain preliminary construction work that PCH claims to have performed. In addition to these counts, the complaint also alleges unjust enrichment, conversion and a claim for "Monies Had and Received." Plaintiff seeks to hold Mangiameli personally liable on all counts under a veil-piercing theory.

1

Defendants have filed a motion to dismiss this diversity suit under Rule 12(b)(1), arguing that subject-matter jurisdiction is lacking because the parties are not diverse and the amount in controversy is less than $75,000. Defendants have also moved under Rule 12(b)(6) for failure to state a claim. For the reasons stated below, the 12(b)(1) motion is denied. The 12(b)(6) motion is granted with respect to plaintiff's fraud, conversion, and veil-piercing claims and denied with respect to plaintiff's two quasi-contract claims.

## I. BACKGROUND

In June 2014, plaintiff signed a contract to purchase property located at 20 Downs Path in Southampton, New York (the "premises"). (Am. Compl. ¶ 8.) When plaintiff purchased the premises, he intended to demolish the house that was already on the premises and construct a new house that he would sell for a profit. (Id. ¶ 9.) Plaintiff took out a $1.7 million loan from Bank of America to finance the project. (Declaration of Gerald Sprayregen ("Sprayregen Decl." ¶ 5.) The sale of premises closed on September 19, 2014. (Am. Compl. ¶ 13.)

Almost immediately after plaintiff signed the contract to purchase the premises, plaintiff began negotiating an agreement with PCH whereby PCH would demolish the existing house and build a new 6,500 square-foot house, with construction to be substantially completed by June 30, 2015. (Id. ¶ 9; Draft Construction Agreement, Decl. of Peter Mangiameli ("Mangiameli Decl.") Ex B at 3.) The entire project was estimated to cost around $3 million. (Sprayregen Decl. ¶ 5.)

On August 5, 2014, plaintiff paid PCH $10,000, with the understanding that the money was being advanced toward actual work and would be paid back to plaintiff if the parties were unable to reach a construction agreement.[1] (Am. Compl. ¶ 16.)

---

[1] Defendants maintain that this $10,000 payment was made pursuant to a good-faith deposit engagement letter. (Mangiameli Decl. ¶¶ 5–6.) According to defendants, under the terms of the letter, if the project was cancelled, PCH would bill plaintiff at a rate of $150.00 per hour for all work performed prior to the cancellation and would refund Plaintiff any excess funds. (Id. ¶¶ 5–6 & Ex. A.)

2

The parties continued their extended negotiations over the proposed construction contract. (Id. ¶ 17.) On October 2, 2014, the parties agreed in writing that plaintiff would pay PCH $50,000 in exchange for the demolition of the existing house, pool, deck and landscaping (the "Demolition Agreement").[2] (Id. ¶ 18–19.) On October 6, 2014, plaintiff sent PCH a $50,000 wire transfer. (Id. ¶ 19.) At the time, the parties still not had agreed on a construction contract.

Between October 10, 2014 and October 18, 2014, plaintiff e-mailed defendants about various matters involving the demolition agreement and the parties' attempts to negotiate a construction agreement. Those e-mails are discussed more fully infra.

Ultimately, the parties were unable to agree on a construction agreement. (Id. ¶ 24.) The negotiations appear to have broken down sometime in October 2014. PCH never performed the demolition work required by the Demolition Agreement. (Id. ¶ 20.)

On October 30, 2014, plaintiff filed his initial complaint in this suit, alleging, *inter alia*, breach of contract and fraud based on PCH failure to perform the demolition or any other preliminary services.

On November 4, 2015, PCH issued plaintiff an invoice totaling $34,050.00 for services PCH alleges to have performed pursuant to the letter agreement.

On January 23, 2015, defendants filed a motion to dismiss the complaint pursuant to Rule 12(b)(1) and 12(b)(6). On February 13, 2015, plaintiff filed an amended complaint, which added a new claim alleging that PCH's November 4 invoice was fraudulent because PCH did not perform the claimed work. (Am. Compl. ¶¶ 28, 46). The amended complaint also added additional paragraphs to support plaintiff's claim for consequential damages on his breach of contract claim. (Id. ¶¶ 30–32, 40.)

---

[2] The record does not include a copy of the Demolition Agreement.

In April 2015, defendants renewed their motion to dismiss under 12(b)(1) and 12(b)(6). On May 11, 2015, three days after plaintiff filed his opposition to the motion, plaintiff sold the premises for $4.1 million. (Defs.' Reply Mem. at 3, Pl.'s Sur-Reply at 2.)

## II. DISCUSSION

### A. Subject Matter Jurisdiction

A district court has subject matter jurisdiction based on diversity of citizenship if the suit is between citizens of different states and "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332. Here, defendant contests both diversity of citizenship and the amount in controversy.

**1. Diversity of Citizenship**

Under § 1332, an individual's citizenship is determined by his domicile. Linardos v. Fortuna, 157 F.3d 945, 948 (2d Cir. 1998). Domicile is "the place where a person has his true fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning." Id. at 948. Although a person may have multiple residences, he can only have one domicile at any given time. Natl. Artists Mgt. Co., Inc. v. Weaving, 769 F. Supp. 1224, 1227 (S.D.N.Y. 1991).

Plaintiff has established that Florida is his domicile. Although plaintiff admits that he owns property in Bridgehampton and resides there for part of the summer, plaintiff attests that: Florida is his primary residence; he has filed federal income tax returns with a Florida address for more than ten years; and he maintains a Florida driver's license, which was re-issued in 2009. (Sprayregen Decl. ¶¶ 1–2 & Ex. A (plaintiff's Florida driver's license).). Moreover, an October 10, 2014 email that defendants provided to the Court suggests that plaintiff spends a majority of

his time in Florida, presumably for tax purposes. (Reply Declaration of Peter Mangiameli ("Mangiameli Reply Decl.") Ex. B.)

In the face of this evidence, defendants argue that plaintiff is actually domiciled in New York because all of plaintiff's correspondence with PCH listed his Bridgehampton home as his address. That fact alone is clearly not enough to rebut plaintiff's evidence, which establishes that Florida is his domicile.

**2. Amount in Controversy**

Plaintiff contends that his breach of contract claim, which seeks damages of "no less than" $100,000, satisfies the $75,000 amount-in-controversy threshold. (Am. Compl. ¶ 41.) The Court agrees.

### i. Standard for Determining the Amount in Controversy

When a plaintiff files a diversity suit in federal court and the defendant challenges the amount in controversy, courts apply a standard that is heavily weighted in favor of the plaintiff.

> A party invoking the jurisdiction of the federal court has the burden of proving that it appears to a 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount. This burden is hardly onerous, however, for we recognize a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy. To overcome the face-of-the-complaint presumption, the party opposing jurisdiction must show "to a legal certainty" that the amount recoverable does not meet the jurisdictional threshold. Our cases have set a high bar for overcoming this presumption . . . . <u>[E]ven where [the] allegations leave grave doubt about the likelihood of a recovery of the requisite amount, dismissal is not warranted</u>.

<u>Scherer v. Eq. Life Assurance Socy. of U.S.</u>, 347 F.3d 394, 397 (2d Cir. 2003) (emphasis added and citations and internal quotation marks omitted).

To demonstrate a filing in bad faith, "[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." <u>Wolde-Meskel v. Vocational Instr. Project Community Services, Inc.</u>, 166 F.3d 59, 63 (2d Cir. 1999).

"Of course, a plaintiff may not rely upon a claim for damages that cannot be legally awarded under state law in order to meet the threshold amount." Brown v. New York State S. Ct. for Second Jud. Dist., 680 F. Supp. 2d 424, 429 (E.D.N.Y. 2010). "But the test remains severe, allowing a finding that the amount in controversy falls below the threshold only in three situations: '1) when the terms of a contract limit the plaintiff's possible recovery; 2) when a specific rule of substantive law or measure of damages limits the money recoverable by the plaintiff; and 3) when independent facts show that the amount of damages was claimed by the plaintiff merely to obtain federal court jurisdiction.'" Id. (quoting Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction 3d § 3702).[3]

Cases invoking the third exception—independent facts that show bad faith—generally involve egregious scenarios where a plaintiff's litigation conduct indicates that the amount of damages was inflated merely to show jurisdiction. See Arnold v. Troccoli, 344 F.2d 842 (2d Cir. 1965) (dismissing case where plaintiff originally sought damages below the amount-in-controversy threshold in state court and later filed suit in federal courts seeking higher damages without any showing of changed circumstances or developing injuries); Efereyan v. Gateway 2000, Inc., 97-CV-481, 1998 WL 175887, at *2 (E.D.N.Y. Apr. 13, 1998) (dismissing case where plaintiff initially alleged $50,000 in consequential damages, and then "cross[ed] out this figure and [wrote] in the sum of $75,000 by hand"); cf. Deutsch v. Hewes St. Realty Corp., 359 F.2d 96, 100 (2d Cir. 1966) (explaining that dismissal of a case where there "is independent evidence . . . tending to prove that the claim had been inflated solely to exceed the jurisdictional

---

[3] The decision in Brown illustrates how favorable this standard is to plaintiffs. In Brown, the court declined to dismiss a suit concerning a bank's two-week delay in releasing funds to the plaintiff. Although the court observed that "it seems highly remote that plaintiff's difficulty in dealing with his London bank and not being able to drive for two weeks can result in a damage award of about $72,000 in damages," the case could not be dismissed because "the test [for amount-in-controversy] is not one of probability." Brown, 680 F. Supp. 2d at 429.

threshold" is permissible because "such cases poses no danger that the judge will pass on the merits of issues that properly should be passed upon by the jury." (citation omitted)).

### ii. Analysis

Plaintiff's breach of contract claim only exceeds the $75,000 amount-in-controversy threshold if plaintiff's alleged consequential damages are included in the calculation.[4]

Plaintiff's consequential damages theory is as follows. In order to meet plaintiff's goal of finishing construction by July 2015, demolition of the existing house and numerous other tasks, including framing and enclosing the new house, needed to be completed before winter weather began. (Sprayregen Decl. ¶ 16.) Plaintiff maintains that, by the time he realized that defendants were not going to perform the demolition work required by the Demolition Agreement, it was too late for plaintiff to obtain a contractor to perform all the necessary work before winter began. (Id. ¶ 17.) This, in turn, caused plaintiff to face additional interest costs on the loan and left plaintiff with the prospect of increased construction costs because of the delay and a building boom in Southampton. (Id. ¶¶ 19–20; Am. Compl. ¶¶ 40, 29.) Plaintiff maintains that defendants were aware that he was financing the purchase and construction, and that any delays would cause him to pay additional interest and have other adverse consequences.[5] (Sprayregen Decl. ¶¶ 7–8; Am. Compl. ¶ 12.)

Defendants challenge plaintiff's consequential damages claim on three grounds.

---

[4] Plaintiff's ordinary breach of contract damages are, at most, $60,000—a number that assumes none of the work for which PCH sought payment was actually performed. Defendants admit that plaintiff is entitled to a refund of $25,522.02 and that they stand ready, willing, and able to pay that amount. However, because defendants have not actually made this payment, that amount is still, technically, in controversy.

[5] Plaintiff submitted a declaration that attempts to set forth a factual basis for this damages theory. Defendants point out that the declaration does not state when plaintiff realized that defendants would not perform the demolition work. Also, although the declaration states that plaintiff was unable to secure another contractor to perform all the necessary work, the declaration does detail any of plaintiff's efforts in this regard.

First, defendants argue that plaintiff's amended complaint does not plead a plausible claim for consequential damages. To recover consequential damages under New York Law, a plaintiff must plead and prove that "those damages were the natural and probable consequences of the breach, and were contemplated at the time the contract was executed." Atkins Nutritionals, Inc. v. Ernst & Young, LLP., 301 A.D.2d 547, 549 (App. Div. 2d Dep't 2003) (dismissing claim for consequential damages where the complaint failed to allege that those damages were within the contemplation of the parties at the time the contract was executed). "The rule that damages must be within the contemplation of the parties is a rule of foreseeability." Ashland Mgt. Inc. v. Janien, 82 N.Y.2d 395 (N.Y. 1993). "The breaching party need not have foreseen the breach itself, however, or the particular way the loss came about." Id. "It is only necessary that loss from a breach is foreseeable and probable." Id.

Plaintiff alleges that, during the contract negotiations, he disclosed his financing arrangement and construction timetable to defendants. Defendants appear to argue that those allegations are insufficient to plead consequential damages because that disclosure was made in the context of negotiations over the proposed construction agreement, which was never finalized. Given the close relationship between the Demolition Agreement and the parties' negotiations over the construction agreement, defendants' suggestion that plaintiff's disclosures are utterly irrelevant to the Demolition Agreement is not persuasive. Notably, the Demolition Agreement was agreed upon during the parties' extended negotiations over the proposed construction agreement. Defendants also suggest, without citation to any authority, that consequential damages cannot be awarded because the neither the Demolition Agreement nor the proposed construction contract included provisions concerning carrying costs or liquidated damages. Such provisions, however, are not a prerequisite for consequential damages. See Kenford Co., Inc. v.

8

County of Erie, 73 N.Y.2d 312, 320 (N.Y. 1989) ("In the absence of any provision [concerning lost profits], the commonsense rule to apply is to consider what the parties would have concluded had they considered the subject." (emphasis omitted)).

Second, defendants contend, without citation to a single case, that plaintiff's consequential damages claim must excluded from the amount in controversy because the declaration that plaintiff submitted is contradicted by e-mails that plaintiff authored in October 2014. For example, an October 10 e-mail sent to Mangiameli states that plaintiff had already begun attempts to sell the property and suggests that plaintiff's own schedule and the parties' inability to agree on a construction contract were likely the decisive factors that prevented any construction from going forward in 2014. And, in an October 18 e-mail, plaintiff informs Mangiameli that plaintiff has an opportunity to hire a different contractor on plaintiff's terms, but would give PCH a final opportunity to match those terms. Defendants contend that this e-mail contradicts the assertion in plaintiff's declaration that he was unable to obtain another builder. Although these e-mails raise "grave doubt" that plaintiff could have ever recovered consequential damages, that is insufficient to show, to a "legal certainty," that the amount-in-controversy has not been met.

Finally, defendants argue that plaintiff misled the Court because his May 8, 2015 declaration, which he submitted to support his damages claims, did not inform the Court that, at the time, the premises were already in the process of being sold. The sale of the premises ultimately closed three days later, on May 11, 2015—according to defendants, plaintiff reaped a $600,000 profit on the sale.

Because the property was sold in May 2015, three months after the filing of the amended complaint, the sale is irrelevant to the amount-in-controversy analysis. When considering a

9

challenge to the alleged amount in controversy, courts look at the facts as of the date that the suit was filed and do not consider subsequent events. Wolde-Meskel, 166 F.3d at 62. "Evidence concerning events that post-date the filing of a complaint is relevant only to the extent that it casts light on whether recovery was *never* legally possible or whether a plaintiff had a good faith belief, at the time the complaint was filed, that the jurisdictional requirement was met." Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Trust Co. of Chicago, 93 F.3d 1064, 1071 (2d Cir. 1996) (emphasis in original). The May 11 sale does not change the fact that, on the date the amended complaint was filed, plaintiff could have still gone through with his intended construction plans and incurred increased interest and construction costs. See id. at 1071 (holding that, where a contract permitted plaintiff to recover costs for improvements it made to property, plaintiff's post-filing decision not to undertake the improvements did not reduce the amount in controversy because it remained possible at the time the complaint was filed that plaintiff would undertake the improvements).

Because the amended complaint satisfies the amount in controversy requirement, defendants' motion to dismiss for lack of subject matter jurisdiction is denied.

**B. 12(b)(6) Motion for Failure to State a Claim**

    **1. Standard**

On a motion to dismiss under Rule 12(b)(6), the court only considers the allegations of the complaint. The court takes the complaint's factual allegations to be true and draws all reasonable inferences in the plaintiff's favor. Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009). That principle, however, is "inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Moreover, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556).

### 2. Fraudulent Inducement

Under New York law, a plaintiff alleging fraud must plead: (1) a material misrepresentation; (2) made by a defendant knowing that it was false when made; (3) with the intent to defraud; (4) upon which the plaintiff reasonably relies; and (5) which causes the plaintiff injury. Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001) (citing Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413 (N.Y. 1996)).

In his opposition brief, plaintiff argues that Mangiameli misrepresented: (1) that he would negotiate timely and in good faith towards a construction agreement; and (2) that the money plaintiff advanced to PCH would be used for demolition work. (Pl.'s Mem. at 8.)

Plaintiff's argument that Mangiameli mispresented that he would negotiate in good faith fails because, *inter alia*, the complaint never alleges Mangiameli made such a representation.

Plaintiff also claims that defendants committed fraud by misrepresenting that the $50,000 plaintiff paid pursuant to Demolition Agreement would be used for demolition work. This claim fails because it is duplicative of plaintiff's breach of contract claim.

Under New York law, "where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." Telecom Int'l Am., Ltd. v. AT

11

& T Corp., 280 F.3d 175, 196 (2d Cir. 2001). In other words, "simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim." Id.

The amended complaint alleges that "[n]otwithstanding Plaintiff's provision of the Advanced Funds in good faith and reasonable reliance on the promise that the funds would be utilized for actual demolition and related work <u>as represented in the Demolition</u> Agreement and otherwise, Defendants failed to do any work." (Am. Compl. ¶ 23 (emphasis added).) Because plaintiff claims that the alleged misrepresentation about defendants' performance was made in the Demolition Agreement itself, plaintiff's fraud claim must be dismissed as duplicative of his contract claim. See Wall v. CSX Transp., Inc., 471 F.3d 410, 417 (2d Cir. 2006) (allowing fraud claim to proceed because the alleged oral promises which preceded the written [contract] and the written [contract] itself" did not "address common topics").

### 3. Fraudulent Billing

Defendants argue that plaintiff's fraudulent billing claim should be dismissed because: (1) plaintiff improperly pled this claim based "on information and belief"; and (2) plaintiff has not alleged that he reasonably relied on the allegedly fraudulent bills in any manner. The Court agrees and dismisses the fraudulent billing claim.

Paragraph 28 of the Amended Complaint states:

> "<u>[o]n information and belief</u>, Defendants generated false invoices that purport to show actual work performed, such as "control estimate, take offs & qualifying bids," and "Scheduling & Coordination – sitework. In fact, no work whatsoever was actually performed, and these invoices amount to nothing more than fraudulent attempts to improperly retain Plaintiff's money."

(Am. Compl. ¶ 28 (emphasis added).)

Plaintiff's opposition brief simply ignores defendants' "information and belief" argument. Plaintiff does not advance any argument as to why he should be permitted to plead this allegation on "information and belief."

"To satisfy the pleading standard for a misleading statement or omission under Rule 9(b), a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Employees' Ret. System of Govt. of the Virgin Islands v. Blanford, 794 F.3d 297, 305 (2d Cir. 2015) (quoting Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004)). When a plaintiff attempts to satisfy Rule 9(b) with allegations based on information and belief, the plaintiff must "set forth the factual basis for that belief." Johnson v. The U. of Rochester Med. Ctr., 686 F. Supp. 2d 259, 266 (W.D.N.Y. 2010).

Because plaintiff did not provide a statement of the facts upon which his "information and belief" allegations are based, the Court dismisses plaintiff's fraudulent billing claim.

The Court also agrees with defendants that plaintiff fails to allege reasonable reliance for this claim. The amended complaint does not even include a conclusory allegation that plaintiff relied on the allegedly fraudulent invoices. The only allegation that references reasonable reliance is paragraph 49, which is clearly inapplicable to the fraudulent billing claim. Moreover, even if plaintiff had included a conclusory allegation of reasonable reliance, his claim would still fail because the complaint is devoid any facts suggesting that plaintiff relied, in any manner, on the allegedly fraudulent invoices or suffered any damages because of them.

**4. Claims for Conversion, Unjust Enrichment, and Monies Had and Received**

Plaintiff has alleged non-contractual claims for conversion, unjust enrichment, conversion, and "monies had and received."

Citing <u>Clark-Fitzpatrick, Inc. v. Long Island R. Co.</u>, 70 N.Y.2d 382 (1987), defendant argues that these three claims should be dismissed because they all stem from the breach of a contract. However, in <u>Clark-Fitzpatrick</u>, the court's decision to dismiss the plaintiff's quasi-contractual claims was based on the fact that there was "a valid written agreement, the existence of which was undisputed, and the scope of which clearly covers the dispute between the parties." <u>Id.</u> at 389. In this case, the existence of the Demolition Agreement appears to be disputed. Defendants' motion papers never concede that the Demolition Agreement existed and characterize plaintiff's $50,000 payment simply as "an advance against future demolition and construction work to be performed by PCH." (Defs.' Mem. at 3.)

Although a plaintiff cannot ultimately recover on both an unjust enrichment claim and a breach of contract claim, a plaintiff may plead an unjust enrichment claim in the alternative to a breach of contract claim where the validity or existence of the contract at issue is in dispute. <u>See</u> <u>Dragushansky v. Nasser</u>, No. 12-CV-9240, 2013 WL 4647188, at *8–9 (S.D.N.Y. Aug. 29, 2013). This logic appears to apply equally to plaintiff's claim for "monies had and received," Defendants offer no arguments to the contrary. Accordingly, the Court denies defendants' motion to dismiss that claim and the unjust enrichment claim.

As to the conversion claim, plaintiff argues that, in the context of a contractual dispute, a conversion claim is viable if the breach of contract resulted in "some 'wrong' that is separately actionable." <u>Citadel Mgt., Inc. v. Telesis Trust, Inc.</u>, 123 F. Supp. 2d 133, 148 (S.D.N.Y. 2000). However, the alleged "wrongs" plaintiff raises are the same alleged acts of fraud that he unsuccessfully sought to plead as independent fraud claims. The first alleged fraud, which was dismissed as duplicative of plaintiff's contract claim, is insufficient to state a conversion claim. And, plaintiff cannot premise a conversion claim on his allegation of fraudulent billing, which

was already found to be deficient. See Silverman Partners, L.P. v. First Bank, 687 F. Supp. 2d 269, 286 (E.D.N.Y. 2010) (holding that because the underlying wrong of plaintiff's conversion claim was fraud, plaintiff had to allege the fraud with particularity pursuant to Rule 9(b).) Accordingly, plaintiff's conversion claim is dismissed.

### 5. Piercing the Corporate Veil

"[P]iercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." Morris v. New York State Dept. of Taxn. and Fin., 82 N.Y.2d 135, 141 (N.Y. 1993)

Here, plaintiff alleges, based on entirely on information and belief, that:

Defendant Mangiameli failed to observe corporate formalities; utilizes PCH for personal purposes, including by utilizing its bank accounts and corporate funds for personal transactions including paying personal debts, and by shuttling funds between personal and corporate accounts; utilizing a vehicle or vehicles owned or leased in PCH's name for personal errands, travel and other purposes; utilizing a common phone number established in the name of PCH for Mangiameli's personal use; utilizing PCH's office space to attend to Mangiameli's personal business; and otherwise operating PCH as Mangiameli's own alter ego.

(Am. Compl. ¶ 35.)

Defendants argue that Mangiameli should be dismissed from this suit because plaintiff's veil-piercing allegations are conclusory and pled on "information and belief."

Plaintiff argues that his veil-piercing allegations are sufficient, citing Moses v. Martin, 360 F. Supp. 2d 533 (S.D.N.Y. 2004). Moses, a case that predates Iqbal and Twombly, found a veil-piercing claim sufficient based on what plaintiff asserts are similar allegations. However, as defendants point out, Moses is distinguishable because the plaintiff's allegations were not made on information and belief. Plaintiff does not advance any argument as to why his allegations on information and belief are appropriate or why such a pleading rises to the level of a plausible

claim. The Court concludes that plaintiff's veil-piercing allegations are insufficient to state a plausible claim.

Moreover, plaintiff's veil-piercing allegations also fail because plaintiff does not allege that Mangiameli used his alleged domination and control to commit a wrong that resulted in an unjust loss or injury to plaintiff. Even if Mangiameli did dominate and control PCH, the mere fact that Mangiameli caused PCH to breach the Demolition Agreement is not, standing alone, sufficient to allege veil-piercing. And, there are no allegations that PCH was undercapitalized or that Mangiameli stripped PCH's assets to render it judgement proof. See Bogosian v. All Am. Concessions, 06-CV-1633, 2011 WL 4460362, at *9 (E.D.N.Y. Sept. 26, 2011) (explaining that "[e]ntry into a transaction without the present ability or expectation of ability to perform is sufficiently wrongful for veil piercing purposes" and that "a classic example of a 'fraud or wrong' . . . is the stripping of the assets of the dominated corporation for the purposes of rendering it judgment-proof.")

The amended complaint suggests that the purported wrong here is the fact that defendants "spent the $60,000 [paid by plaintiff] to cover their own debts and other projects." (Am. Compl. ¶ 33 (alleging this fact on information and belief).) The Court assumes *arguendo* that if Mangiameli had used the $60,000 for his own personal debts and expenses, that such conduct might constitute a wrong for veil-piercing purposes. But plaintiff's complaint does not allege such conduct. Instead, plaintiff simply lumps the two defendants together and alleges that the "defendants" spent this money to cover "their own debts and on other projects." If PCH spent this money on debts owed by the corporation and corporate projects, then Mangiameli's domination of PCH was not used to commit any wrong. Accordingly, this allegation is

insufficient to allege a plausible veil-piercing claim.[10] See Iqbal, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" (quoting Twombly, 550 U.S. at 557.)

Plaintiff's veil-piercing claim is hereby dismissed.[11]

### III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss for lack of subject matter jurisdiction is denied. Defendants' motion to dismiss under Rule 12(b)(6) is: (1) granted with respect to plaintiff's fraud, conversion and veil-piercing claims; and (2) denied with respect to plaintiff's two quasi-contractual claims.

Dated: January 21, 2016
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE

---

[10] This allegation falls short of even the conduct in Moses, the sole case cited by plaintiff. In Moses, the court found sufficient a complaint that alleged that the individual defendant "used the proceeds from racketeering activity for personal purposed, [sic] including the purchase of luxury items, international travel, Swedish massage treatments for [her] and her ex-boyfriend and other non-legitimate purposes." 460 F. Supp. 2d at 541.

[11] Even if plaintiff did plead a plausible veil-piercing claim, the Court would have likely bifurcated discovery and stayed discovery for the veil-piercing claim until after a summary judgment on the underlying liability claims. Such an approach would be warranted given that any ultimate recovery by plaintiff is likely to be less than $60,000, and nothing in the current record suggests that PCH would be unable or unwilling to pay a judgment against it.